1

2

3

4

5

6

7

8                      IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RICHARD J. LEWIS,

11            Petitioner,                    2: 06 - cv - 0481 - MCE TJB

12        vs.

13   M. VEAL, et al.,

14            Respondents.          ORDER, FINDINGS AND

15                                  RECOMMENDATIONS

16   _____/

17                         I.  INTRODUCTION

18          Petitioner, Richard Lewis, is a state prisoner proceeding with a petition for writ of habeas

19   corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of twenty-five

20   years to life plus two years after his conviction in 1981 of first degree murder with a firearm

21   enhancement.  Petitioner challenges the September 2004 decision by Governor Schwarzenegger

22   reversing the April 2004 decision by the Board of Prison Terms (the "Board") which had granted

23   Petitioner parole.  Petitioner presents several claims in his petition; specifically:  (1) the

24   Governor did not exercise his discretion in the manner required by California Penal Code § 3041

25   in reversing the Board ("Claim I"); (2) the Governor exceeded his authority when he denied

26   parole by concluding that Petitioner's commitment offense involved the infliction of torture

                                        1

("Claim II"); (3) the Governor's decision denying parole did not comport with due process because the Governor's decision regarding the circumstances of the commitment offense was not supported in the record ("Claim III"); the Governor's decision on the factors surrounding the commitment offense violated Petitioner's due process rights because it was arbitrary and capricious ("Claim IV"); (5) the Governor's decision violated Petitioner's due process rights because it relied on the unchanging factors of Petitioner's commitment offense ("Claim V"); and (6) the Governor's role in reversing the Board's decision violated the Ex Post Facto Clause ("Claim VI").  Petitioner requests:  (1) an order to show cause; (2) an order to conduct discovery and/or an evidentiary hearing; and (3) an order for supplemental briefing.   For the following reasons, Petitioner's requests are denied and it is recommended that his federal habeas petition be denied.

## II.  FACTUAL[1] AND PROCEDURAL BACKGROUND

On the evening of July 26, 1980, Richard Lewis murdered 33-year-old Richard Cain by shooting him multiple times with a .22-caliber revolver.

> On the day of the murder, Mr. Lewis' girlfriend told him that Mr. Cain had made unwanted sexual advances at her two months earlier.  Mr. Lewis became very angry and subsequently told his girlfriend's sister, who was married to Mr. Cain at the time, "If you care anything about [Mr. Cain], you better tell him to get out of town."
>
> Afterward, Mr. Lewis and his girlfriend's brother obtained a revolver and some bullets.  After loading the weapon, Mr. Lewis put it under the driver seat of his car.  The two men then went to the home of Mr. Lewis' girlfriend, where they found Mr. Cain. Mr. Lewis a short while later suggested that the men go out to get some marijuana and Mr. Cain decided to go along.  Mr. Lewis drove instead to a remote location, where he ordered Mr. Cain out of the car and pulled out the revolver.  He then shot Mr. Cain once in the buttocks and once in the chest.  Either before or in between shots, Mr. Cain asked, "What did I do?"  As Mr. Cain lay wounded on the ground, Mr. Lewis gave the revolver to his girlfriend's brother and told him to shoot Mr. Cain.  The brother refused, and

---

[1] The factual background of the commitment offense is taken from the Governor's decision which reversed parole which is attached to Respondents' answer at Ex. 3.

> gave the revolver back to Mr. Lewis.  Mr. Lewis then walked over
> to where Mr. Cain lay, lifted Mr. Cain's head by the chin to look
> him in the face, and said, "Richard Cain, I want you to know who's
> doing this to you."  Mr. Lewis then shot Mr. Cain twice in the side
> of the head, killing him.

(Resp'ts' Answer, Ex. 3.)  In 1981, Petitioner was convicted of first degree murder with a firearm

enhancement.  On April 20, 2004, the Board conducted a subsequent parole consideration

hearing.  The Board ultimately concluded that the Petitioner was suitable for parole and would

not pose an unreasonable risk of danger to society or a threat to public safety if released from

prison.  On September 13, 2004, the Governor reversed the Board's decision and found that

Petitioner would continue to pose an unreasonable risk of danger to society if paroled at that

time.

Petitioner challenged the Governor's decision denying him parole in the Fresno County

Superior Court via a state habeas petition.  The Superior Court denied Petitioner's state habeas

petition on January 6, 2005.  In denying the petition, that court stated the following:

> Having reviewed the petition for writ of habeas corpus transferred
> from the superior court in the County of Marin and filed on
> December 28, 2004, the court finds no error justifying the
> requested relief.  (Cf. In re Van Houten, (2004) 116 Cal.App.4th
> 339, In re Smith (2003) 114 Cal.App.4th 343, In re McClendon
> (2003) 113 Cal.App.4th 315, In re Capistran (2003) 107
> Cal.App.4th 1229, and In re Rosenkrantz (2002) 29 Cal.4th 616.)
> The petition is denied.

(Resp'ts' Answer, Ex. 5 at p. 2.)  On March 3, 2005, the California Court of Appeal, Fifth

Appellate District summarily denied the petition without discussion or citation.  On February 1,

2006, the California Supreme Court summarily denied the petition stating, "Petition for writ of

habeas corpus is denied.  (See In re Rosenkrantz (2002) 29 Cal.4th 616.)."  (Resp'ts' Answer,

Ex. 7a at p. 2.)

In March 2006, Petitioner filed the instant federal habeas petition.  After an answer and a

traverse were filed, Petitioner was appointed counsel in December 2007.  On November 5, 2009,

Petitioner was released on parole.  Petitioner was then ordered to show cause why his habeas

1   petition should not be dismissed in light of his release from prison on parole.  Petitioner

2   responded to the order to show cause.  On March 10, 2010, this Court concluded that the action

3   would not be dismissed in light of the fact that "plaintiff could still benefit by a favorable ruling

4   that may result in the shortening of his parole."

5                    III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

6          An application for writ of habeas corpus by a person in custody under judgment of a state

7   court can only be granted for violations of the Constitution or laws of the United States.  See 28

8   U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v.

9   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

10  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

11  and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

12  320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

13  decided on the merits in the state court proceedings unless the state court's adjudication of the

14  claim:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

15  clearly established federal law, as determined by the Supreme Court of the United States; or (2)

16  resulted in a decision that was based on an unreasonable determination of the facts in light of the

17  evidence presented in state court.  See 28 U.S.C. 2254(d).  Nevertheless, where a state court

18  provides no reasoning to support its conclusion as in this case, a federal habeas court

19  independently reviews the record to determine whether the state court was objectively

20  unreasonable in its application of clearly established federal law.  See Musladin v. Lamarque,

21  555 F.3d 830, 835 (9th Cir. 2009); see also Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir.

22  2000), overruled on other grounds, Lockyer v. Andrande, 538 U.S. 63 (2003).

23         As a threshold matter, this Court must "first decide what constitutes 'clearly established

24  Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71

25  (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under § 2254(d)(1)

26  is the governing legal principle or principles set forth by the Supreme Court at the time the state

                                                  4

1  court renders its decision.'"  Id. (citations omitted).  Under the unreasonable application clause, a

2  federal habeas court making the unreasonable application inquiry should ask whether the state

3  court's application of clearly established federal law was "objectively unreasonable."  See

4  Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may not issue the writ

5  simply because the court concludes in its independent judgment that the relevant state court

6  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

7  application must also be unreasonable."  Id. at 411.  Although only Supreme Court law is binding

8  on the states, Ninth Circuit precedent remains relevant persuasive authority in determining

9  whether a state court decision is an objectively unreasonable application of clearly established

10  federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only the

11  Supreme Court's precedents are binding . . . and only those precedents need be reasonably

12  applied, we may look for guidance to circuit precedents.").

13  IV.  DISCUSSION OF PETITIONER'S CLAIMS

14  A.  Claim I

15  In Claim I, Petitioner asserts that the Governor did not exercise his discretion in the

16  manner required by California Penal Code § 3041.  California Penal Code section 3041 sets forth

17  the state's legislative standards for determining parole for life-sentenced prisoners.  Section

18  3041(a) provides that, ""[o]ne year prior to the inmate's minimum eligible release date a panel . .

19  . shall again meet with the inmate and shall normally set a parole release date."  Cal. Penal Code

20  § 3041(a).  However, subsection (b) states an exception to the regular and early setting of a life

21  sentence term if the Board determines "that the gravity of the current convicted offense or

22  offenses, or the timing and gravity of current or past convicted offense or offenses, is such that

23  the consideration of public safety requires a more lengthy period of incarceration for this

24  individual."  Cal. Penal Code § 3041(b).

25  Claim I asserts that the Governor misapplied state law.  As such, this Claim is not

26  cognizable on federal habeas review.  See Estelle v. McGuire, 502 U.S. 62, 68 (1991) ("In

5

1   conducting habeas review, a federal court is limited to deciding whether a conviction violated the

2   Constitution, laws or treaties of the United States.").  Petitioner is not entitled to federal habeas

3   relief on Claim I that the Governor misapplied state law.

4          B.  Claims II, III, IV and V

5          Claims II, III, IV and V take issue with the Governor's analysis in ultimately determining

6   that Petitioner was not suitable for parole.  While Petitioner makes several arguments within

7   these claims that will be analyzed herein, the issues presented fundamentally turn on whether the

8   Governor's decision denying parole comported with due process under the law.

9          The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives

10  a person of life, liberty, or property without due process of law.  A person alleging a due process

11  violation must first demonstrate that he or she was deprived of a protected liberty or property

12  interest, and then show that the procedures attendant upon the deprivation were not

13  constitutionally sufficient.  See Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 459-60 (1989).

14         A protected liberty interest may arise either from the Due Process Clause itself or from

15  state laws.  See, e.g., Bd. of Pardons v. Allen, 482 U.S. 369, 373 (1987).  The United States

16  Constitution does not, in and of itself, create a protected liberty interest in the receipt of a parole

17  date.  See Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).  However, if a state's statutory parole

18  scheme uses mandatory language, it "creates a presumption that parole release will be granted"

19  when or unless certain designated findings are made, thereby giving rise to a constitutional

20  liberty interest.  McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002) (quoting Greenholtz v.

21  Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1, 12 (1979)).

22         The full panoply of rights afforded a defendant in a criminal proceeding is not

23  constitutionally mandated in the context of a parole proceeding.  See Pedro v. Or. Parole Bd., 825

24  F.2d 1396, 1398-99 (9th Cir. 1987).  The Supreme Court has held that a parole board's

25  procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a

26  decision informing him of the reasons he did not qualify for parole.  See Greenholtz, 442 U.S. at

6

16.

As a matter of state law, denial of parole to California inmates must be supported by at least "some evidence" demonstrating current dangerousness.  See Hayward v. Marshall, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citing In re Rosenkrantz, 29 Cal. 4th 616, 128 Cal. Rptr. 2d 104, 59 P.3d 174 (2002); In re Lawrence, 44 Cal. 4th 1181, 82 Cal. Rptr. 3d 169, 190 P.3d 535 (2008); In re Shaputis, 44 Cal. 4th 1241, 82 Cal. Rptr. 3d 213, 190 P.3d 573 (2008)). "California's 'some evidence' requirement is a component of the liberty interest created by the parole system of the state."  Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010) (per curiam). Thus, a reviewing court such as this one must "decide whether the California judicial decision approving the governor's decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement or was it 'based on an unreasonable determination of the facts in light of the evidence.'"[2]  Hayward, 603 F.3d at 562-63.

The analysis of whether some evidence supports denial of parole to a California state inmate is framed by the state's statutes and regulations governing parole suitability determinations.  See Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007), overruled in part on other grounds, Hayward, 603 F.3d 546.  This court "must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence' . . . constituted an unreasonable application of the 'some evidence' principle."  Id.

As previously stated, California Penal Code section 3041 sets forth the state's legislative

---

[2] To the extent that the Respondent argues that Petitioner's Claims are not cognizable on federal habeas review under AEDPA or that Petitioner does not have a federally protected interest in parole, the Ninth Circuit has specifically held that "due process challenges to California courts' application of the 'some evidence' requirement are cognizable on federal habeas review under AEDPA," and that "California's 'some evidence" requirement is a component of the liberty interest created by the parole system of that state."  Cooke, 606 F.3d at 1213 (citing Hayward, 603 F.3d at 561-64).

standards for determining parole for life-sentenced prisoners.  Section 3041(a) provides that,

""[o]ne year prior to the inmate's minimum eligible release date a panel . . .  shall again meet

with the inmate and shall normally set a parole release date."  Cal. Penal Code § 3041(a).

However, subsection (b) states an exception to the regular and early setting of a life-sentenced

prisoner's term, if the Board determines "that the gravity of the current convicted offense or

offenses, or the timing and gravity of current or past convicted offense or offenses, is such that

the consideration of public safety requires a more lengthy period of incarceration for this

individual."  Cal. Penal Code § 3041(b).

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to

be considered by the Board in its parole suitability findings for murderers.  "The regulation is

designed to guide the Board's assessment of whether the inmate poses 'an unreasonable risk of

danger to society if released from prison,' and thus whether he or she is suitable for parole."  In

re Lawrence, 44 Cal. 4th at 1214, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  The Board is directed to

consider all relevant, reliable information available regarding:

> the circumstances of the prisoner's social history; past and present
> mental state; past criminal history, including involvement in other
> criminal misconduct which is reliably documented; the base and
> other commitment offenses, including behavior before, during and
> after the crime; past and present attitude toward the crime; any
> conditions of treatment or control, including the use of special
> conditions under which the prisoner may safely be released to the
> community; and any other information which bears on the
> prisoner's suitability for release.

15 Cal. Code Regs. § 2402(b).  The regulation also lists several specific circumstances which

tend to show suitability or unsuitability for parole.  Id. § 2402(c)-(d).[3]  The overriding concern is

_____

[3] Circumstances tending to indicate unsuitability include:

> (1) Commitment Offense.  The prisoner committed the offense in an especially
> heinous, atrocious or cruel manner.  The factors to be considered include:
>> (A) Multiple victims were attacked, injured or killed in the same or
>> separate incidents.
>> (B) The offense was carried out in a dispassionate and calculated manner,

8

public safety and the focus is on the inmate's *current* dangerousness.  See In re Lawrence, 44

Cal. 4th at 1205, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  Thus, the proper articulation of the

> such as an execution style murder.
> (C) The victim was abused, defiled or mutilated during or after the offense.
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
> (2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
> (3) Unstable social history.  The prisoner has a history of unstable or tumultuous relationships with others.
> (4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
> (5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.
> (6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

15 Cal. Code Regs. § 2402(c).

     Circumstances tending to indicate suitability include:

> (1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
> (2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.
> (3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving the suffering of the victim, or indicating that he understands the nature and magnitude of the offense.
> (4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.
> (5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.
> (6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.
> (7) Age.  The prisoner's present age reduces the probability of recidivism.
> (8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
> (9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

Id. § 2402(d).

standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that the inmate's release would unreasonably endanger public safety.  See In re Shaputis, 44 Cal. 4th at 1254, 82 Cal. Rptr. 3d 213, 190 P.3d 573.  There must be a nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.  In re Lawrence, 44 Cal. 4th at 1227, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  As to the circumstances of the commitment offense, the Lawrence court concluded that:

> [T]he Board or the Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance only if those facts support the ultimate conclusion that an inmate continues to pose an unreasonable risk to public safety.  Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are probative to the central issue of current dangerousness when considered in light of the full record before the Board or the Governor.

Id. at 1221, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

I.  2004 Board Decision

The panel of the Board that presided over Petitioner's 2004 parole suitability hearing considered the factors bearing on Petitioner's suitability for parole and weighed those factors in favor of releasing Petitioner on parole.  The Board stated the following in deciding to grant parole:

> The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  One, the prisoner have [sic] no juvenile record of assaulting others.  While imprisoned – however, we do note that there was an adult history, and that was for stealing . . . Mail, and the prisoner was on probation at the time.  We do note that, but other than that there's – but there certainly is no assaultive behavior here.  While imprisoned the prisoner has enhanced his ability to function within the law by participating in self-help programs.

Most noteworthy, I believe, is the self-help programs and also, I believe real noteworthy, is the certificates that were reviewed in the C-File, in which the prisoner has participated in a Hospice Program. He's donated his own time while working in the Inmate Day Labor Program. AA have been ongoing and he also, at one time he participated in the Victims – VORG, Victim Offenders Program I believe it was. And the Christian . . . KAIROS Program and there's numerous citations in the file where he participated in numerous Christian related programs. Also, AA have been – throughout his file is replete with participation in the – in those kinds of programs, AA, Alcohol Anonymous.

Also noted in the file is that the prisoner has been assigned to the Inmate Day Labor Program for a substantial amount of time. And the Inmate Day Labor Program, the Board looks more favorable on those kinds – on that type of program than on, say, just a regular vocational program. And the reason we look favorable on it, because not only did the prisoner learn a trade in electronics or in the electrical field, but he actually applies the trade on a daily basis and he became proficient. And typically you'll see in a vocational program, an individual or an inmate will be referred to as an apprentice, but in the file the inmate is referred to as a journeyman Electrician and certainly we note that. Also, I noted in the file that the prisoner did, while in IDL, or Inmate Day Labor, the inmate did enhance his ability by picking up an additional skill and that was in the field of Arc and . . . Welding. So, the prisoner has those skills too and it's attributed to his work experience in Inmate Day Labor. So, certainly in this case, the Board feel fairly certain the prisoner does have a marketable skill that he could put to use as soon as he's released from prison.

Now, the prisoner did not have a major criminal history, as previously noted. However, the Board did note that there was an arrest and conviction and the prisoner was on probation at the time that he committed the offense for mail theft. However, because of maturation, growth and greater understanding and advanced age, it appears to the Board and that decision – was – we came to that decision after reviewing his entire record, that the prisoner has reduced his probability of recidivism through maturation.

The prisoner does have parole plans. He have a place to say [sic]. And let me say at this point, the Board is going to order that a transfer of parole to Sacramento. And for the prisoner – and the reason for this order is that the prisoner does have family in that area and he does have a job offer in that area. So, the Board has ordered that he be transferred to Sacramento. We do note that the prisoner has maintained close family ties while imprisoned via letters. And the ones that we can speak specifically to is the letter from his brother and also from his wife, who he's been in a state of matrimony or married to his wife for over 20 years. And we think that's - that that's noteworthy and we have letters in the file.

Also, we feel that the prisoner has maintained positive behavior for a significant – have recently maintained positive institutional behavior while incarcerated.  And we think that's significant improvement in self-control.  Now, the Panel went through and we reviewed every 115 in the file.  There's not a 115 or a 128 in the file that the Panel did not review and to take into consideration.  And just for the record, we note that the prisoner received a 115 on 2/24, 1982 for lack of participation.  On 7/24/82, for possession of US currency, on 1/27/83, for force and violence, on 1/11/87 for force and violence, on 12/25/87, for stimulants and sedatives and on 1/20/89, for a fistfight.  And his last 115 that we note in the file was on 5/11, 1993, and that's for disobeying a direct order.  Whatever happened in 1993 – which is over 11 years since his last 115, and we do note that that was reduced.  However, whatever it was, it appears that the prisoner got it in 1993.  It appears that whatever it was, he got it.  His behavior for the past 11 years has – it will be 11 years next month, he's been disciplinary free for serious violations.  However, we did go back and review the 128 write-ups in the file and we note that there are some 128 write-ups in the file.  And the last 128 write-up, however, was in 1995 and that was 4/15/95, for destruction of state property, the 128 being a minor write-up.  And also, there was on 5/6, 1992 for sleeping.  On 5/7, 1990 for failure to report to work, on 7/20/88, for shirttails, meaning he didn't have his shirttail tucked in and on 6/5/88, for direct orders.  And on 10/29/87, for conduct and on 5/19/87, for contraband . . . And on 2/16/82, for failure to report.  Now, that appears to be all of the 128 write-ups that's in the file.  And the Board took into consideration all of these 128s before making our decision.  And after a thorough review of the C-file, we feel that since 1995 there have been no write-ups and certainly we feel that the prisoner have [sic] demonstrated a significant amount of time that he can program in a structured environment.  And after that review, we did find him suitable for parole.

The prisoner shows signs of remorse.  He indicates that he understands the nature and the magnitude of his crime and accepts responsibility for his criminal behavior and has the desire to change towards good citizenship.  We also note that there's a current Board report in the file and we note that the correctional counselor sees the prisoner as presenting . . . He writes in December of 2003, a few months – it's been about five months ago, he writes:  "Considering the elapsed time since the commitment offense and Lewis' present institutional behavior, it is believed that Lewis presents a low risk to the public if released for parole.  It is not known how Lewis would adjust to parole.  But considering Lewis' positive achievements in acquiring education, training, work experience and his spiritual growth that has contributed towards enhancing his life while incarceration [sic], are indicators that he has remained constant in his continued effort to secure a successful parole."  So, certainly the correctional counselor saw him as being suitable for parole . . . .

12

Recent psychological factors – recent psychological factors appear to – are positive in terms of suitability.  Dr. Gary W. Collins, Ph.D., writes in his most recent report that's dated . . . 10/2/01 available information suggests the probability for violent offense in Mr. Lewis' case is low . . . . so let me just read what Dr. Collins said again, Gary W. Collins, Ph.D.  He writes:  "Available information suggests the probability for violent offense in . . . Mr. Lewis' case is low.  Of the 30-some individuals about whom I have written reports for the Board, this man appears to be one of the most competent."  So, he writes you a very supportive report.  And also, there's a letter from Raymond C. Crawford.  "The diagnostic psychopathology is somewhat related to the offense.  Violence potential in the past have been above average.  Violence potential is below average.  In a less controlled setting such as the community, he would maintain present gains and continue to improve.  If paroled, there are no psychological – psychiatric recommendations.  If retained, continue in his present program." So he have [sic] two verifiable, good psychological evaluations.

Now, we go to the base life term of which the prisoner was convicted is murder, that's 187.  This crime was committed on . . . July 26th, 1980.  The Panel finds that B-II is appropriate and we used the matrix for first-degree murder.  And offense that was committed on or after 11/8/78 and that would be 2403, lower case B, in parenthesis.  So, we find that B-II is appropriate because the prisoner did have a prior relationship with the individual and he was shot, so death was – he wasn't tortured.  He was shot in the butt, but he wasn't tortured . . . death appears to be almost instantly.

The base life offense for which the prisoner has been convicted is murder, 187 . . . that was committed or occurred on July 26th, 1980 . . . . The prisoner had a prior relationship with the individual.  We aggravated this also.  The reasons we aggravated it, because we felt that the prisoner had a clear opportunity to cease.  A clear opportunity, but instead he continued and he shot the individual one more time.  After he shot him the first time, he could have stopped but he continued until he killed the victim.  The prisoner was on probation at the time that this crime was committed . . . . we do note that the District Attorney's letter did voice opposition. We gave that a lot of consideration.  We reviewed the District Attorney's letters but most of his objections in the letter was based on the commitment offense and there was no program issues that was noted in the . . . letter.  But we did take that into consideration. And that's pretty much it.

(Resp'ts' Answer, Ex. 4b at p. 34-45.)

//

ii.  2004 Governor's Decision

As previously stated, the Governor reversed the Board's decision.  The governor may review the Board's parole decision and is authorized to reverse or modify it, applying the same standards as the Board.  See Cal. Const. art. V, § 8(b); Cal. Penal Code § 3041.2.  Although the governor undertakes an independent, *de novo* review of an inmate's suitability for parole, his decision must be based on the same statutory factors and the same evidentiary record that was before the Board.  See In re Rosenkrantz, 29 Cal. 4th at 660-61, 128 Cal. Rptr. 2d 104, 59 P.3d 174.  The governor has discretion to weigh the suitability factors differently than the Board and may choose to be more stringent or cautious in determining whether an inmate poses an unreasonable risk to public safety.  See In re Shaputis, 44 Cal. 4th at 1258, 82 Cal. Rptr. 3d 213, 190 P.3d 573.  The governor's decision must still reflect due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, and must be supported by some evidence in the record.  See In re Lawrence, 44 Cal. 4th at 1204, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

After reciting a summary of Petitioner's offense, Governor Schwarzenegger stated the following:

> Mr. Lewis was 19 years old when he murdered Mr. Cain and, although he had been arrested two months earlier for possessing stolen mail, had no documented history of assaultive or violent conduct at the time.  Since his incarceration, he has been disciplined at least six times for serious-rules violations – two of which were for fist fighting with other inmates and one for assaulting another inmate – and counseled eight times for minor misconduct.
>
> He has, however, remained discipline-free for more than a decade and has worked during his almost-23-year incarceration to enhance his ability to function within the law upon release.  Although Mr. Lewis has not participated in any educational programming as recommended by the Board in is 2001 decision to deny parole to him, he has improved himself vocationally by obtaining various office and construction training and working in several highly skilled positions, including as an electrician, within the institutional setting.  He has participated in an array of self-help and therapy, including Alcoholics Anonymous, Victims and

Offenders Learning Together, Anger Management Groups, Breaking Barriers, Conflict Resolution, and juvenile-outreach programs.  He has also taken classes in Christian Temperament and Anger Management Resolution, American Sign Language, and hospice care, and he has acted as a literary tutor and a volunteer via the Pastoral Care Program assisting terminally ill inmates.  Additionally, Mr. Lewis has received favorable mental-health and prison reports, has maintained relationships with family, and has made realistic parole plans that include living with his wife of 22 years and putting to use his construction training by working for a construction company.  These are all factors supportive of parole for Mr. Lewis.

Likewise, there is some evidence in the record before me to indicate that Mr. Lewis is now remorseful for his crime.  Various mental-health evaluations have noted his signs of remorse throughout the years, and he stated to the Board at his 2004 hearing, "I'm extremely regretful for the loss of life that I've cause Mr. Cain, the pain and suffering that I've caused his family, the guilt and embarrassment that I have brought on my own family."  But also before me in the record is some evidence that Mr. Lewis minimizes his responsibility for Mr. Cain's murder.  During his 1997 mental-health evaluation, Mr. Lewis claimed that his girlfriend's brother planned the murder and fired all of the shots.  At his 2004 hearing, he told the Board that his girlfriend's brother fired the first two shots and then gave the revolver to him, and he fired the last two shots at point-blank range.  This version contradicts the appellate court's which states that Mr. Lewis fired all four shots.  Mr. Lewis says he accepts full responsibility for the murder but seems to minimize the magnitude of his conduct by placing some of the blame on his girlfriend's brother and also on the victim, Mr. Cain.  He told the Board at the 2004 hearing that his girlfriend's brother was "the prime mover of my idea to shoot Richard Cain" and said also that Mr. Cain had become more and more disrespectful of him.

Mr. Lewis went to great lengths to orchestrate the murder of Mr. Cain.  After his girlfriend told him about the sexual advances that Mr. Cain allegedly made months earlier at her, Mr. Lewis spent the next six hours coldly planning Mr. Cain's murder.  As evidence of his cool composure, according to the appellate decision, "None of the people who were visited or otherwise came into conduct with [Mr. Lewis during the six-hour period] testified that [he] appeared angry or upset . . . ."  Mr. Lewis also did not appear upset when he encountered Mr. Cain at his girlfriend's house shortly before the murder.  Moreover, although Mr. Lewis already owned a .38 caliber gun, on the day of his murder and his girlfriend's brother paid an acquaintance $20 to borrow a .22 caliber revolver.  According to the appellate decision, this indicated that Mr. Lewis's "desire to avoid association of the murder weapon with the gun he was known to own."  Mr. Lewis and his girlfriend's brother went

15

to two different residences to obtain bullets for the revolver, and once the revolver was loaded Mr. Lewis stored it under the driver seat of his car.  After Mr. Cain got into Mr. Lewis's car, Mr. Lewis drove for 40 minutes to an isolated spot where he viscously murdered Mr. Cain.  This was a calculated and chilling crime.  The murder committed by Mr. Lewis was not only intentional, it involved the infliction of torture.  Before Mr. Lewis shot Mr. Cain twice in the head, killing him, he shot him once in the buttocks and once in the chest, causing Mr. Cain to lay wounded on the ground for a period of time while undoubtedly in extreme pain.  During this period, after Mr. Lewis and his girlfriend's brother quibbled over who would fire the next shot at Mr. Cain, Mr. Lewis lifted Mr. Cain's head, looked him in the face, and told him that he wanted him to "know who is doing this to you."  This to me demonstrates that Mr. Lewis intended to inflict extreme pain on Mr. Cain – and did so for his own personal satisfaction.  Even if Mr. Lewis were to refute this, his conduct inarguably demonstrates his exceptionally callous disregard for Mr. Cain's suffering and – particularly when coupled with Mr. Lewis's exceedingly trivial reason for committing this crime – also makes this first-degree murder an especially cruel and heinous one.  According to Mr. Lewis's statements to the Board at his most recent hearing, the reason behind the execution was that "[t]he alleged sexual assault on [his girlfriend] . . . was the final act of disrespect [by Mr. Cain] that [his] adolescent mind was able to endure . . . ."  Mr. Lewis planned and carried out Mr. Cain's murder, ultimately shooting him four times, including twice at point-blank range while looking him in the face, over "disrespect."  The gravity alone of this crime is a sufficient basis on which to conclude that Mr. Lewis's release from prison to parole at this time would pose an unreasonable risk to society.  The Fresno County District Attorney, in her letter to the Board opposing parole, concurs.

After carefully considering the same factors the Board of Prison Terms must consider, I believe Mr. Lewis would continue to pose an unreasonable risk of danger to society if paroled at this time.

(Resp'ts' Answer, Ex. 3.)

   iii.  Discussion of Claims II, III and IV

   Claims II, III and IV are all interrelated.  For example, in Claims II and III, Petitioner argues that the Governor committed constitutional error in finding that Petitioner's commitment crime involved torture.  In Claim IV, Petitioner argues that the Governor's reasoning that the commitment offense was carried out in an especially heinous and cruel manner was arbitrary and capricious.  Thus, these arguments center around whether there was some evidence in the record

to support the Governor's findings related to the relevant factors of parole unsuitability as

applied to the commitment offense.

For the following reasons, Petitioner's arguments under these Claims do not merit

granting federal habeas relief.[4]   For example, the Governor stated that even if Petitioner could

refute that he tortured his victim, the murder was calculated and involved an exceptional callous

disregard for human suffering.  This finding was supported by some evidence in the record.

As previously noted, circumstances of the commitment offense are one of the factors that

the Governor considers in determining the suitability for parole.  Whether the circumstances of

the commitment offense show that a Petitioner is unsuitable for parole are the following:

> (A) Multiple victims were attacked, injured or killed in the same or
> separate incidents.
> (B) The offense was carried out in a dispassionate and calculated
> manner, such as an execution-style murder.
> (C) The victim was abused, defiled or mutilated during or after the
> offense.
> (D) The offense was carried out in a manner which demonstrates
> an exceptionally callous disregard for human suffering.

---

[4] In Claim II, Petitioner argues that the Governor's finding that the murder involved the infliction of torture was unsupported in the record and violated his Sixth and Fourteenth Amendment rights because it was not specifically found by the jury at trial.  This issue does not necessarily need to be analyzed because the Governor stated that even if this finding was refuted by Petitioner, there were other significant aggravating relevant factors surrounding the commitment offense as explained infra (most notably that the crime was calculated and showed a callous disregard for human suffering).  In support of this argument, Petitioner cites to Apprendi v. New Jersey, 530 U.S. 466 (2000) and Blakely v. Washington, 542 U.S. 296 (2004).  The rule from Apprendi and its progeny is that "under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence [than the statutory maximum] must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence."  Cunningham v. California, 549 U.S. 270, 281 (2007).  In California, the sentence for a person convicted of first degree murder is death, life without parole, or twenty-five years to life.  See Cal. Penal Code § 190(a).  In this case, Petitioner was sentenced to a term of years to life imprisonment, thus, the sentence is a life sentence until Petitioner is found suitable for parole.  See In re Dannenberg, 34 Cal. 4th 1061, 1083-84, 23 Cal. Rptr. 3d 417, 104 P.3d 783 (2005) ("[A]n inmate whose offense was so serious to warrant, at the outset, a maximum term of life in prison, may be denied parole during whatever time the Board deems required for 'this individual' by 'consideration of the public safety.'") (quoting Cal. Penal Code § 3041(b)).  The Governor's determination that the commitment crime involved the infliction of torture does not increase the penalty for Petitioner's crime, but rather is a decision on whether his already imposed imprisonment should continue and, therefore, Apprendi/Blakely are not applicable to this issue.

1                (E) The motive for the crime is inexplicable or very trivial in
               relation to the offense.

2

3   15 Cal. Code. Regs. § 2402(c)(1).  The record supports the Governor's conclusion that the

4 commitment offense was carried out in a manner that demonstrated an exceptionally callous

5 disregard for human suffering and was done in a dispassionate calculated manner.  In so finding,

6 the Governor described how Petitioner obtained the murder weapon and drove the victim to an

7 isolated spot.  Petitioner then fired two shots into the victim which wounded him.  Petitioner then

8 discussed with his girlfriend's brother who would fire the next shot.  Ultimately, Petitioner

9 picked up the victim's head and told him that he wanted him to "know who's doing this to you"

10 before firing the fatal shots into the victim's head.  Thus, the Governor's conclusion regarding

11 the unsuitability factors surrounding the commitment offense was supported by some evidence.

12 (See Resp'ts' Answer Ex. 8.)  Therefore, Claims II, III and IV do not warrant federal habeas

13 relief.

14                     iv.  Claim V

15        However, merely because there was some evidence in the record to support the relevant

16 unsuitability factors underlying the commitment offense does not necessarily mean that

17 Petitioner's due process rights were met by the Governor.  Accordingly, in Claim V, Petitioner

18 argues that his due process rights were violated when the Governor relied only on the unchanging

19 factors of his commitment offense in denying Petitioner parole.  The Governor stated that "the

20 gravity of this crime alone" was a sufficient basis to deny parole.  Nevertheless, contrary to

21 Petitioner's argument, the Governor did cite to other factors besides the commitment offense that

22 first require analysis before reaching Petitioner's argument in Claim V.

23        At the outset, the Governor noted several factors that supported Petitioner's parole

24 eligibility.  For example, the Governor noted that Petitioner remained disciplinary free for more

25 than a decade while incarcerated and that he had improved himself vocationally, including

26 training and working as an electrician.  The Governor also approvingly cited to Petitioner's

1  numerous self-help classes as well as his favorable mental-health and prison reports.  The

2  Governor also noted that Petitioner had realistic parole plans.  Finally, the Governor stated that

3  there was some evidence that the Petitioner was remorseful for his crime.  All of these positive

4  factors as cited by the Governor are supported in the record.

5      Nevertheless, the Governor did not only cite to the commitment offense in his decision

6  denying parole.  The Governor relied on the fact that Petitioner minimized his actual physical

7  actions during the commitment offense ("minimizing his responsibility"), as well as the fact that

8  Petitioner seemed to blame the victim and his girlfriend's brother for the reasons why he

9  committed the murder ("lack of insight").

10     An inmate's mental state and past and present attitude towards the crime are proper

11 considerations for a parole determination.  See 15 Cal. Code Regs. §§ 2402(b), 2402(d)(3).  The

12 Governor can reverse the grant of parole "when evidence in the record supports the conclusion

13 that the circumstances of the crime continue to be predictive of current dangerousness . . . [in

14 cases where] the record also contains evidence demonstrating that the inmate lacks insight into

15 his or her commitment offense."  Lawrence, 44 Cal. 4th at 1228, 82 Cal. Rptr. 3d 169, 190 P.3d

16 535; see also In re Lazor, 172 Cal. App. 4th 1185, 1202, 92 Cal. Rptr. 3d 36 (2009) ("An

17 inmate's lack of insight into, or minimizing of responsibility for, previous criminality, despite

18 professing some responsibility, is a relevant consideration."); In re Rozzo, 172 Cal. App. 4th 40,

19 62 n.9, 91 Cal. Rptr. 3d 85 (2009) ("While it is improper to rely on a prisoner's refusal to address

20 the circumstances of the commitment offense in denying parole, evidence that demonstrates a

21 prisoner's insight, or lack thereof, into the reasons for his commission of the commitment offense

22 is relevant to a determination of the prisoner's suitability for parole.").  "Lack of insight,"

23 however, is probative of unsuitability only to the extent that it is both (1) demonstrably shown by

24

25

26

1   the record and (2) rationally indicative of the inmate's current dangerousness.[5]   See In re

2   Calderon, 184 Cal. App. 4th 670, 690, 109 Cal. Rptr. 3d 229 (2010).

3        In this case, the Governor determined that Petitioner minimized his responsibility for the

4   commitment offense because his version of what actually transpired during the murder was

5   different than the Court of Appeal's rendition of the facts as stated in its opinion on direct appeal.

6   Petitioner's denial of facts may clearly show a lack of insight and current dangerousness

7   sufficient to warrant denying parole.  See In re Palermo, 171 Cal. App. 4th 1096, 1110-12, 90

8   Cal. Rptr. 3d 101 (2009) (illustrating such cases).

9        In In re Shaputis, 44 Cal. 4th at 1260, 82 Cal. Rptr. 3d 213, 190 P.3d 573, the California

10  Supreme Court upheld a parole denial based in part on Shaputis' failure to grasp the nature of his

11  commitment offense.  While Shaputis stated that his conduct was wrong and that he felt "some

12  remorse" for his crime, he continued to claim that his wife's murder was an accident and sought

13  to minimize his responsibility.  In addition, the recent psychological reports indicated that

14  Shaputis' character remained unchanged and that he was "unable to gain insight into his

15  antisocial behavior despite years of therapy and rehabilitative programming."  Id. (internal

16  quotation marks omitted).

17       In In re McClendon, 113 Cal. App. 4th at 321-22, 6 Cal. Rptr. 3d 278, the California

18  Court of Appeal determined that the appellant failed to accept full responsibility for his crime by

19  claiming that the killing of his wife was unplanned and unintentional.  The court explained that

20  the underlying facts demonstrated that appellant wore rubber gloves, carried a loaded handgun, a

21  bottle of acid and a wrench when he arrived at his estranged wife's residence.  See id.  Petitioner

22  maintained that "he simply wanted to show his new gun to his estranged wife, and that the

23

24       [5] Consideration of whether an inmate lacks insight into or accepts responsibility for the
    commitment offense does not conflict with the statutory requirement of Cal. Penal Code §
25  5011(b) that the Board "shall note require, when setting parole dates, an admission of guilty to
    any crime for which an inmate was committed."  In re Elkins, 144 Cal. App. 4th 475, 493-94, 50
26  Cal. Rptr. 3d 503 (2006).

gloves, wrench, and industrial acid were brought for household chores." Id. at 322, 6 Cal. Rptr. 3d at 278.

In In re Palermo, the California Court of Appeal determined that the inmate's different version of the crime did not mean that he remained a danger to public safety.  The court explained that:

> [I]n contrast to the situations in Shaputis and McClendon, defendant's version of the shooting of the victim was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational.  And, unlike the defendants in Van Houten, Shaputis, and McClendon, defendant accepted "full responsibility" for his crime and expressed complete remorse; he participated effectively in rehabilitative programs while in prison; and the psychologists who evaluated him opined that he did not represent a risk of danger to the public if released on parole.  Under these circumstances, his continuing insistence that the killing was the unintentional result of his foolish conduct (a claim which is not necessarily inconsistent with the evidence) does not support the Board's finding that he remains a danger to public safety.

Id. at 1112, 90 Cal. Rptr. 101.

In this case, Petitioner's version of events do not necessarily strain credulity nor are they physically impossible, irrational or delusional.  Petitioner acknowledged killing Mr. Cain.  He admitted to the Board that he deliberately took Mr. Cain out to the isolated area to shoot him.  This does not appear to be a case like In re Shaputis where the inmate claimed that the murder was an accident.  Instead, Petitioner admitted to shooting Mr. Cain for the purposes of killing him.  Additionally, this case was not like In re McClendon.  Here, Petitioner did not claim that the killing of Mr. Cain was unplanned.  Petitioner admitted that he planned to kill Mr. Cain.  He told the Board his intentions were to kill Mr. Cain and that he knew he was going to kill Mr. Cain when he was driving to the isolated area.  Thus, Petitioner does not claim that the killing was an accident like the inmate in In re McClendon.  In light of the record that was before the Governor, it appears that the mere fact that Petitioner's version of what actually transpired at the isolated area where Mr. Cain was killed does not necessarily mean that he minimized his

1   responsibility for the actual physical acts of shooting Mr. Cain to kill him.  The fact that

2   Petitioner did not accept every aspect of the Board's version of crime is not "some evidence" of

3   current dangerousness.  Cf. In re Lawrence, 44 Cal. 4th at 1213-14, 82 Cal. Rptr. 3d 169, 190

4   P.3d 535 ("Because the parole decision represents a prospective view - essentially a prediction

5   concerning the future - and reflects an uncertain conclusion, rarely (if ever) will the existence of a

6   single isolated fact in the record, evaluated in a vacuum, suffice to support or refute that

7   decision."); see also Ngo v. Curry, Civ. No. 08-620, 2010 WL 3835621, at *7 (N.D. Cal. Sept.

8   28, 2010) ("That petitioner does not fully accept every aspect of the Board's version of the events

9   is not 'some evidence' of current dangerousness."); Jones v. Mendoza-Powers, Civ. No. 06-379,

10   2010 WL 1267259, at *6 (E.D. Cal. Mar. 31, 2010) ("That Petitioner does not fully accept every

11   aspect of Rachel's transcript version of events is not 'some evidence' of current dangerousness.")

12   (citations omitted).

13        Nevertheless, the Governor also cited to the fact that Petitioner placed blame for the

14   murder on his girlfriend's brother and on the victim.  During the hearing before the Board in

15   2004, Petitioner explained the "causative" factors of the crime:

16          I was living in fear of Richard Cain.  I'd witnessed Richard Cain's
attitude and behaviors toward me as consistently grow more and more

17          disrespectful day by day.  There was constant tension growing
between myself and Mr. Cain.  He left me with the impression that

18          he had very little respect for me as a man and ultimately, I shot and
killed Richard Cain because I was unable to deal with the . . .

19          pressure and the stress and the fear that was associated with being
in his presence.  The alleged sexual assault on Diana Hunt was the

20          – in the bedroom where I slept was the final act of disrespect that
my adolescent mind was able to endure at that time.  I was 19 years

21          old.  Richard Cain was a 33-year-old man.  It took two years for
me, in Christian Temperament and Anger Management therapy, for

22          me to get to a point where I understood the root causes of how and
why I could take someone else's life.  And I found that in my

23          youthful ignorance, I allowed a very corrupt and brutal street
mentality to dictate and define how I would engage situations that I

24          was confronting.  Daily life in the streets that raised me in New
Orleans carried with it a very, very low level approach to dealing

25          with issues that cause tension and division amongst men.  Therapy
classes forced me to look back and look into it, and looking back, I

26          recognized that human life, in my little, dysfunctional street

1   environment was measured in much different terms, less equitable
2   terms perhaps, than other more affluent areas of our society.
    Where mean looks, name-calling, speaking negatively behind
3   people's back, and these types of things would give arise to some
    very, very violent behavior.  I allowed Richard Cain to agitate me
4   to a point when I gave in to a conditioned response.  I needed to
    have some insight into what led me to do what I did.  And not for
5   the sole purpose of being able just to communicate this to you,
    although that is important, but more importantly, under no
6   circumstances would I ever entertain the thought of committing a
    crime like this again or any other crime for that matter.  And I'm
7   extremely regretful for the loss of life that I've caused Mr. Cain,
    the pain and suffering that I've caused his family, the guilty and
8   embarrassment that I have brought on my own family.  This wasn't
    just about Richard Cain.  It could have been Jim Jones, Joe Jones,
9   Bob Smith.  This was about a malevolent lifestyle that I embraced
    in my youth.

10  (Resp'ts' Answer, Ex. 4a at p. 16-17.)  Yet, in addition to appearing to blame the victim for what

11  transpired, Petitioner also seemed to blame his girlfriend's brother for the murder.  For example,

12  Petitioner stated before the Board in 2004 that:

13                  Bruce Hunt [Petitioner's girlfriend's brother] was – he was the
                    prime mover of my idea to shoot Richard Cain.  Bruce made it
14                  perfectly clear to me that, man, listen, Richard Cain does not like
                    you.  He is not an individual that you want to toy with.  He has no
15                  respect for you.  It has been shown in his little, small, petty
                    encroachments.  The last being the sexual assault, not an advance,
16                  but assault on Diana, in which she testified to in the preliminary
                    trial and that's on the record.  Don't – if you're going to toy
17                  around with him.  If you're going to deal with this cat, deal with
                    him.  Don't play games with him because ultimately, he's going to
18                  deal with you.  And that's ultimately what led me – and it didn't
                    take a lot and I must be truthful about that, with Richard Cain and
19                  myself.  We were two individuals that had grown not to like each
                    other very much at all.

20

21  (Resp'ts' Answer, Ex. 4a at p. 19.)

22          In In re Van Houten, 116 Cal. App. 4th at 354-55, 10 Cal. Rptr. 3d 406, the California

23  Court of Appeal determined that the inmate needed "further insight" into the murders because

24  she initially stated that Charles Manson was more responsible for her actions than she was.  The

25  court determined that "[g]iven the lack of insight into her participation in such a horrendous

26  crime, as well as her recent nonparticipation in self-help programs, the Board was justified under

                                              23

1  the 'some evidence' standard in considering her need for further counseling a factor supporting

2  parole denial." Id. at 355, 10 Cal. Rptr. 3d 406 (footnote omitted).

3      Similar to In re Van Houten there was at least "some evidence" in the record to support

4  the Governor's finding regarding Petitioner's lack of insight into the commitment offense as

5  Petitioner deflected the reasons for why he committed the murder to other persons (most notably

6  his girlfriend's brother and the victim). Thus, the Governor's decision reversing the grant of

7  parole did not only rely on the unchanging factor of the commitment offense as there was some

8  evidence in the record to support the Governor's rationale regarding Petitioner's lack of insight

9  into his commitment offense.

10      Even if the Governor's reasoning regarding Petitioner's minimization of responsibility

11  and lack of insight into the commitment offense were not supported by the record, it does not

12  follow that Petitioner's due process rights were violated under these facts. Cf. Biggs v. Terhune,

13  334 F.3d 910, 915-16 (9th Cir. 2003) (finding that even where many of the Board's conclusions

14  and factors relied upon were devoid of an evidentiary basis, the petitioner was still not entitled to

15  federal habeas relief because there was other "some evidence" which did not entitle petitioner to

16  federal habeas relief at that time) overruled on other grounds, Hayward, 603 F.3d 546; In re

17  Cerny, 178 Cal. App. 4th 1303, 1310-16, 101 Cal. Rptr. 3d 2000 (2009) (denying state habeas

18  petition where Board's decision to deny parole included many factors that were unsupportable,

19  but also included the factor that petitioner was without verifiable parole plans such that the Board

20  found that petitioner might revert to prior drug use).

21      In Biggs, 334 F.3d at 912, an inmate was serving a sentence of twenty-five years to life

22  and was denied parole after serving fourteen years after his conviction. The Ninth Circuit upheld

23  the denial of the petition for writ of habeas corpus. It determined that while several of the

24  Board's findings that were unsupported, there was some evidence that the inmate was not entitled

25  to relief at this time. The court specifically noted the gravity of the offense. See id. at 916. It

26  noted:

> [a]s in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law.  Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole.

Id.  The court further stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  Id. at 917.

In Sass v. Cal. Bd of Prison Terms, 461 F.3d 1123, 1125-26 (9th Cir. 2006) (Goodwin, J.), overruled on other grounds, Hayward, 603 F.3d 546, the inmate had served eight years of his fifteen years to life prison term.  The Board based its unsuitability determination on the gravity of the inmate's convicted offenses in combination with his prior offenses.  See id. at 1129.  The Ninth Circuit found that these unchanging factors constituted some evidence to uphold the decision.  In so holding, the Ninth Circuit emphasized that Biggs suggested only that reliance on the unchanging factors in the future "'could result in a due process violation.'"  Id. (citing Biggs, 334 F.3d at 917).

Finally, in Irons, the inmate had served sixteen years out of his seventeen years to life sentence.  See 505 F.3d at 849.  The Ninth Circuit determined that the only rationale cited by the Board that was supported with some evidentiary support was its finding regarding the nature of the commitment offense.  The Ninth Circuit determined that:

> we cannot say that there was not "some evidence" to support the Board's determination that Irons was unsuitable for parole under California law.  Specifically, given that his commitment offense, standing alone, is a sufficient basis for deeming a petitioner unsuitable where, as here, there is some evidence to support a finding that "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering" and the "motive for the crime is inexplicable or very trivial in relation to the offense[.]"

Id. at 852-53 (citing 15 Cal. Code Regs. § 2402(c)(1)(D)-(E)).  The Ninth Circuit continued by

25

1   explaining that:

2       [w]e note that in all the cases in which we have held that a parole
    board's decision to deem a prisoner unsuitable for parole solely on
3   the basis of his commitment offense comports with due process,
    the decision was made before the inmate had served the minimum
4   number of years required by his sentence.  Specifically, in Biggs,
    Sass, and here, the petitioners had not served the minimum number
5   of years to which they had been sentenced at the time of the
    challenged parole denial by the Board.  Biggs, 334 F.3d at 912;
6   Sass, 461 F.3d at 1125.  All we held in those cases and all we hold
    today, therefore, is that, given the particular circumstances of the
7   offenses in these cases, due process was not violated when these
    prisoners were deemed unsuitable for parole prior to the expiration
8   of their minimum terms.

9   Id. at 853-54.

10      Based on these cases, it is somewhat unclear where the line of demarcation as described

11  in Biggs triggers a due process violation.  Since Hayward was decided on April 22, 2010, several

12  district court cases have found that Ninth Circuit precedent continues to be that use of the

13  commitment offense to find an inmate unsuitable for parole comports with due process prior to

14  the inmate having served his minimum sentence.  See Sanchez v. Powers, Civ. Nos. 09-634, 08-

15  4162, 07-2628, 2010 WL 3702376, at *10 (C.D. Cal. Aug. 2, 2010) ("At the time of the three

16  parole hearings at issue herein, Petitioner's minimum term of sixteen years had not yet expired.

17  Although it appears here that in each case the Board and superior court relied solely on the

18  commitment offense to deny parole, based on language in Irons and the circumstances of

19  Petitioner's commitment offenses, the Court declines to consider in this case whether reliance on

20  the commitment offense alone violated Petitioner's right to due process, despite his exemplary

21  record in prison, since he had not yet served his minimum term."), report and recommendation

22  adopted by, 2010 WL 3724219 (C.D. Cal. Sept. 8, 2010); Wiggins v. Salazar, Civ. No. 08-1175,

23  2010 WL 2231849, at *1 (E.D. Cal. June 2, 2010) ("Under California law, the inquiry is whether

24  there was some evidence to support the finding that Petitioner is currently dangerous.  The Ninth

25  Circuit's precedent regarding the use of the commitment offense to evidence parole unsuitability

26  has contained language that the use of the commitment offense prior to Petitioner having served

the minium sentence comports with due process.") (citations omitted); <u>Graff v. Finn</u>, Civ. No. 07-1647, 2010 WL 2035587, at *2 (E.D. Cal. May 20, 2010) (Goodwin, J., sitting by designation)[6] ("[I]n <u>Irons v. Carey</u>, the court noted that 'in call the cases which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence.' Here, Petitioner had not served twenty-six years of his twenty-six-years-to-life sentence when the BHP denied him a parole date in 2006. Therefore, the BHP's decision did not, at that time, violate Petitioner's right to due process."); <u>Cyprien v. Swarthout</u>, Civ. No. 08-379, 2010 WL 1689189, at *5 (E.D. Cal. Apr. 26, 2010) ("From <u>Biggs</u>, <u>Sass</u>, and <u>Irons</u>, a district court can clean certain guiding principles in ruling on a California prisoner's application for a writ of habeas corpus addressed to the denial of parole . . . at least until such time as the prisoner has served the minimum sentence imposed, denial of a parole date solely upon the basis of the commitment offense more likely than not does not violate the Due Process Clause.").

As one court in this district has stated, "<u>Sass</u> and <u>Irons</u> appear to make it dependent, at least in significant part, upon the gravity of the commitment offense, how heinous it was, e.g., the extent to which the prisoner acted in callous disregard for human life, the degree of depravity or cruelty shown, and the nature of the victim." <u>Cyprien</u>, 2010 WL 1689189, at *4. In <u>Irons</u>, the Ninth Circuit noted "[b]ecause the murder Sass committed was less callous and cruel than the one committed by Irons, and because Sass was likewise denied parole in spite of exemplary conduct in prison and evidence of rehabilitation, our decision in <u>Sass</u> precludes us from accepting Iron's due process argument or otherwise affirming the district court's grant of relief." 505 F.3d at 853. In <u>Sass</u>, the inmate was convicted of second degree murder, gross vehicular manslaughter, hit and run death, causing injury while driving under the influence and felony

---

[6] It is worth reiterating that Judge Goodwin authored the opinion in <u>Sass</u>.

27

1    drunk driving.  <u>See</u> 461 F.3d at 1125.  He had also been convicted on seven separate occasions

2    for DUI prior to his second degree murder conviction.  <u>Id.</u> at 1126 n.2.

3       In this case, for the reasons previously described, Petitioner's crime of murder in the first-

4    degree was more heinous, callous and cruel than that committed by the inmate in <u>Sass</u>.  Thus, the

5    fact that it is possible that the sole rationale with evidentiary support cited by the Governor was

6    the circumstances surrounding the commitment offense does not violate Petitioner's due process

7    under the facts of this case.

8       Petitioner is not entitled to federal habeas relief on Claim V.  The Governor's decision

9    did not lack some evidence of Petitioner's current dangerousness.  The Governor relied on the

10   relevant factors as stated in Cal. Penal Code § 2402(c)(1) and determined that they outweighed

11   the positive factors.  The decision reflects a nexus between these facts and Petitioner's current

12   dangerousness.  Even if the Governor's reasoning regarding Petitioner's minimization of

13   responsibility and lack of insight into the commitment offense lacked some evidence in the

14   record, Petitioner is not entitled to federal habeas relief on this Claim.  In light of the fact that the

15   Petitioner had not served his minimum term of twenty-seven years when the Governor made this

16   decision and in light of the current state of the law still remaining as stated in <u>Biggs</u>, <u>Sass</u> and

17   <u>Irons</u>, Claim V does not warrant federal habeas relief.

18       C.  Claim VI

19       In his final Claim, Petitioner asserts an Ex Post Facto Clause violation when the

20   Governor reversed his parole grant.  Petitioner was convicted in 1981.  At that time, California

21   law provided that the Board had sole responsibility for deciding whether inmates were suitable

22   for parole.  In 1988, California voters approved Proposition 89 which provided review of the

23   parole decision by the Governor.  Petitioner asserts that because his conviction occurred before

24   the passage of Proposition 89, the Governor's subsequent denial of his parole in 2004 violated

25   the Ex Post Facto Clause.

26       The Ex Post Facto Clause applies to criminal legislation that effects an increase in

criminal punishment, criminalizes conduct that was not previously criminal or requires proof for conviction of an offense that was previously required.  See Collins v. Youngblood, 497 U.S. 37, 42 (1990).  In California Department of Corrections v. Morales, 514 U.S. 499, 514 (1995), the Supreme Court stated that without evidence that the new law substantively changed the definition of criminal conduct or altered the standards of parole eligibility, it "created only the most speculative and attenuated risk of increasing the measure of punishment."

In a factually similar case to the case at bar, the Ninth Circuit rejected an argument by a petitioner that the California Governor's reversal of the Board's decision granting parole violated the Ex Post Facto Clause.  See Johnson v. Gomez, 92 F.3d 964 (9th Cir. 1996).  Ultimately, the Ninth Circuit found as follows:

> In this case, Johnson is similarly unable to demonstrate that an increase in his punishment actually occurred, because, like the petitioner in Morales, he had not been granted parole under the old law.  Under the old law, BPT's decision would have been subject to no review.  Johnson's case is like Dobbert [v. Florida 432 U.S. 282 (1977)], where the petitioner could only speculate whether the jury would have imposed a life sentence had it possessed the final power to decide.  Here, because the BPT's parole decision is not final until after the expiration of the thirty-day gubernatorial review period, it cannot be said with certainty that the BPT would have granted Johnson parole had it possessed final review authority. Johnson argues that, unlike the administrative convenience purpose of the law in Morales, the purpose and effect of the law here is to lengthen prison terms by making it more difficult for convicted murderers with indeterminate sentences to be released on parole. However, the law itself is neutral inasmuch as it gives the governor power to either affirm or reverse a BPT's granting or denial of parole.  Moreover, the governor must use the same criteria as the BPT.  The law, therefore, simply removes final parole decisionmaking authority from the BPT and places it in the hands of the governor.  We cannot materially distinguish this change in the law from that at issue in Mallet v. North Carolina, 181 U.S. [589,] at 590, 21 S.Ct. [730,] at 731.  In Mallet, the Court found no ex post facto violation where the new law allowed for higher court review of intermediate court decisions, even though the petitioner would have been entitled to a final intermediate court decision at the time of his crime.  We therefore conclude that the application of Proposition 89 to authorize the governor's review of Johnson's grant of parole did not violate the Ex Post Facto Clause.

Id. at 967 (internal citations omitted).

Petitioner's arguments are similar to those that were rejected in <u>Johnson</u>.  The Governor's review is based on the same criteria and record used by the Board.  The additional layer of review is neutral and does not, it and of itself, increase Petitioner's punishment.

However, Petitioner also cites to <u>Garner v. Jones</u>, 529 U.S. 244 (2000) in support of his ex post facto argument.  <u>Johnson</u> was decided before the United States Supreme Court decided <u>Garner</u>.  In <u>Garner</u>, the Supreme Court addressed an as-applied ex post factor challenge to the "retroactive application of a Georgia law permitting the extension of intervals between parole considerations."  <u>Id.</u> at 246.  In that case, the Court recognized that the "disadvantage" with respect to an ex post facto violation can come from the terms of the statute themselves or from the statute's application to a particular defendant's sentence.  <u>See id.</u> at 255.  The Court stated that the relevant inquiry is that "[w]hen the rule does not by its own terms show a significant risk, the [petitioner] must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule."  <u>Id.</u>  It determined that the petitioner "must show that *as applied to his own sentence* the law created a significant risk of increasing his punishment."  <u>Id.</u> at 255 (emphasis added).  However, "[a]bsent a demonstration to the contrary, we presume the Board follows its statutory commands and internal policies in fulfilling its obligations."  <u>Id.</u> at 256.  Thus, as the United States Court of Appeals for the District of Columbia has noted:

> <u>Garner</u> outlines two ways in which "significant risk" can be established by a petitioner.  First, it can be established if there are facial distinctions between old and new parole/reparole regulations.  Second, "when the rule does not by its own terms show a significant risk," a claimant may also meet this burden "by [introducing] evidence drawn from the rule's *practical implementation by the agency* charged with exercising discretion, that its retroactive application *will result in a longer period of incarceration than under the earlier rule.*"  The controlling inquiry is one of practical effect.

<u>Fletcher v. Reilly</u>, 433 F.3d 867, 877 (D.C. Cir. 2006) (emphases in original and citations

1    omitted).

2    　　　Petitioner has not overcome the presumption that the Governor followed the "statutory

3    commands and internal policies in fulfilling [his] obligations." Garner, 529 U.S. at 256.  In this

4    case, the Governor's reversal indicates that he considered petitioner's suitability for parole in

5    accordance to the regulations and statutory commands.  While Petitioner does cite to several

6    figures reflecting the Governor's high reversal rate with respect to when the Board grants parole,

7    it does not show that the Governor did not follow his respective commands.  See supra Part

8    V.B.iv; see also Hairston v. Kane, Civ. No. 06-1517, 2009 WL 773431, at *12 (N.D. Cal. Mar.

9    29, 2009) ("The Governor's reversal reflects individualized consideration of petitioner's

10   suitability for parole according to statutory commands and regulations in fulfilling his obligation

11   to review decisions of the Board . . . the authority to review Board decisions granted to the

12   Governor by Proposition 89 did not violate the Ex Post Facto Clause."); Seiler v. Brown, Civ.

13   No. 04-2911, 2007 WL 2501518, at * 5 (N.D. Cal. Aug. 30, 2007) ("Petitioner has not overcome

14   the presumption that the Governor followed the statutory commands and internal policies in

15   fulfilling [his] obligations.  He has said that the governor['s] . . . tough on crime political stance .

16   . . [has] result[ed] in the reversal of all but eight (8) out of approximately three hundred and fifty

17   (350) findings of parole suitability by the Board of Prison Terms.  This . . . reversal rate does not

18   show with specific facts and details that in petitioner's case the Governor did not follow the

19   statutory commands and internal policies in fulfilling his obligation to review decisions of the

20   BPT.").  Thus, for the foregoing reasons, Petitioner is not entitled to federal habeas relief on

21   Claim VI.

22   　　　　　　　　　　　　　　　V.  PETITIONER'S REQUESTS

23   　　　A.  Request for Order to Show Cause

24   　　　Petitioner requests an order to show cause in his petition.  (See Pet'r's Pet. at p. 67.)

25   Respondent answered the petition on June 28, 2006.  Accordingly, Petitioner's request for an

26   order to show cause is denied as moot.

1      B.  Request to Conduct Discovery

2          In his traverse, Petitioner requests discovery.  (See Pet'r's Traverse at p. 23.)  Parties to a

3   habeas proceeding are not entitled to discovery as a matter of course.  See Bracy v. Gramley, 520

4   U.S. 899, 904 (1997).  Rather, "[a] judge may, for good cause, authorize a party to conduct

5   discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery."

6   Rule 6(a), Rules Governing § 2254 cases; see also Bracy, 520 U.S. at 904.  Good cause is shown

7   "where specific allegations before the court show reason to believe that the petitioner may, if the

8   facts are fully developed, be able to demonstrate that he is . . . entitled to relief."  Id. at 909-09

9   (internal quotation marks and citation omitted); see also Pham v. Terhune, 4900 F.3d 740, 743

10  (9th Cir. 2004).  A request for discovery "must also include any proposed interrogatories and

11  requests for admission, and must specify any requested documents."  Rule 6(b), Rules Governing

12  § 2254 Cases.

13         In this case, Petitioner fails to show good cause to warrant his request for discovery.  He

14  fails to include any proposed interrogatories or any request for documents.  This request is

15  denied.

16      C.  Request for an Evidentiary Hearing

17         Next, Petitioner requests an evidentiary hearing.  Pursuant to 28 U.S.C. § 2254(e)(2), a

18  district court presented with a request for an evidentiary hearing must first determine whether a

19  factual basis exists in the record to support a petitioner's claims and, if not, whether an

20  evidentiary hearing "might be appropriate."  Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir.

21  1999); see also Earp v. Ornoski, 431 F.3d 1158, 1166-67 (9th Cir. 2005).  A petitioner requesting

22  an evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief."

23  Earp, 431 F.3d at 1167 (citations omitted).  To show that a claim is "colorable," a petitioner is

24  "required to allege specific facts which, if true, would entitle him to relief."  Ortiz v. Stewart, 149

25  F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted).

26         In this case, an evidentiary hearing is not warranted.  Petitioner failed to demonstrate that

32

1  he has a colorable claim for federal habeas relief for the reasons stated in Part IV.

2      D.  Request for Supplemental Briefing

3      On December 5, 2008, Petitioner requested supplemental briefing in light of the

4  California Supreme Court's decision in <u>In re Lawrence</u>.  This court will not allow piecemeal

5  filing of supplemental briefs in this action.  The applicability of <u>In re Lawrence</u> in this case was

6  analyzed as was <u>Hayward</u> and its progeny in <u>supra</u> Part IV.B.  The request is denied.

7  VI.  CONCLUSION

8      For the foregoing reasons, IT IS HEREBY ORDERED that:

9      1.  Petitioner's request for an order to show cause is DENIED AS MOOT;

10      2.  Petitioner's request to conduct discovery is DENIED;

11      3.  Petitioner's request for an evidentiary hearing is DENIED; and

12      4.  Petitioner's request for supplemental briefing is DENIED.

13      IT IS HEREBY RECOMMENDED that Petitioner's Petition for writ of habeas corpus be

14  DENIED.

15      These findings and recommendations are submitted to the United States District Judge

16  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

17  after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties.  Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

20  shall be served and filed within seven days after service of the objections.  The parties are

21  advised that failure to file objections within the specified time may waive the right to appeal the

22  District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

23  elects to file, petitioner may address whether a certificate of appealability should issue in the

24  event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules

25  Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

26  when it enters a final order adverse to the applicant).

33

DATED:  November 23, 2010

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE